Benjamin Royce CLAYTON,
Jr., Appellant,

v.

Geri Ann SARRATT, Respondent.

No. WD 75177.

Missouri Court of Appeals,
Western District.

Jan. 2, 2013.

Dana M. Outlaw, Lee's Summit, MO, for Appellant.

Brian J. Klopfenstein, Kearney, MO, for Respondent.

Kelly J. Ruark, Liberty, MO, Guardian ad litem.

Before Division Two: LISA WHITE HARDWICK, Presiding Judge, and JAMES M. SMART, JR., and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

Benjamin Royce Clayton, Jr., appeals the judgment of the Circuit Court of Clay County modifying child custody and child support. He argues that the trial court erred in modifying the parenting time schedule and the child's residential designation for educational and mailing purposes, and in improperly shifting the burden of proof. Finding no error, we affirm.

## Factual and Procedural Background [1]

Benjamin Royce Clayton, Jr. (Father), and Geri Ann Sarratt (Mother) have one son together, B.C., born on November 8, 2004. They were never married. Paternity, custody, parenting time, and child support were first established in June 2006 by the Circuit Court of Clay County.[2] The court awarded Father and Mother joint physical and legal custody of B.C., adopted a parenting plan, and designated Father's address as B.C.'s residence for educational and mailing purposes.[3] On April 5, 2010, Mother filed a motion to modify, requesting that she be awarded "primary care, custody and control [of B.C.] . . . subject to the rights of reasonable visitation of [Father]."[4] At trial, however, Mother testified that she was not seeking a modification of the joint custody arrangement; rather, she sought to change B.C.'s address for educational and mailing purposes and to modify the parenting time schedule.[5] On May 14, 2010, Father filed a

---

1. "We view the evidence in the light most favorable to the decree and disregard all contrary inferences and evidence." *Jones v. Jones*, 277 S.W.3d 330, 334 (Mo.App. W.D. 2009).

2. A Parenting and Joint Custody Plan was attached to the judgment. The record on appeal includes the Commissioner's signed Findings and Recommendations, but not the signed judgment of the circuit court. The finality of this judgment is not disputed by either party, and this appeal is not taken from the 2006 judgment.

3. The original parenting schedule was structured around Father's work as a Kansas City firefighter. His schedule, at the time, was thirty-six hours on duty, followed by thirty-six hours off duty. The plan, subject to minor changes due to both parents' work schedules, provided that for each thirty-six-hour period he was off duty, Father had B.C. from 7:00 a.m. on the first day until 7:00 p.m. the following day. The schedule was continuous with no holiday designations. Because of Father's rotating work shifts, the days each week that B.C. was with each parent varied. This schedule was established when B.C. was less than two years old. As noted, *infra*, when B.C. started school full-time, the parties voluntarily modified the parenting time schedule.

4. "[C]ustody may be either 'joint' or 'sole.'" *Hightower v. Myers*, 304 S.W.3d 727, 730 n. 1 (Mo. banc 2010) (quoting § 452.375.1(1), RSMo 2000). Therefore, "[d]esignation of physical custody as 'primary' is erroneous." *Id.*

5. The use of the word "visitation" in Mother's petition is also erroneous as visitation is provided only to non-custodial parents pursuant to section 452.400.1. *See Bell v. Bell*, 125 S.W.3d 899, 904 (Mo.App. W.D.2004).

counter-motion to modify, requesting a modification of Mother's parenting time.[6] He testified that he did not want the court to modify the joint custody arrangement and that he opposed a change in B.C.'s address for educational and mailing purposes. A guardian ad litem (GAL) was appointed.

When the original judgment was entered in 2006, Father lived in Kansas City, Missouri (north of the Missouri River), and Mother lived in Independence, Missouri.[7] Before the motions were filed, Mother moved to Oak Grove, Missouri. When the motions were heard, Mother still lived in Oak Grove, but Father had moved to a new residence in Kansas City, near Liberty, Missouri.[8] In August 2010, B.C. started kindergarten at Bell Prairie Elementary School, a school near Father's original residence. As of the hearing dates, B.C. was seven years old, in the first grade, and enrolled in Liberty Oaks Elementary School, a school near Father's new residence.

Mother is currently employed at a dental clinic in Lexington, Missouri.[9] In 2006, when the judgment was entered, Mother was unemployed. Father continues to be employed as a firefighter in Kansas City, but his work schedule has changed. Father now works twenty-four hours on duty followed by forty-eight hours off duty, on a rotating three-week schedule.[10] In addition, he now works a second job for American Cycle Escorts, a company that provides funeral escorts. He works once or twice each week for American Cycle Escorts, and schedules his shifts so that he works when B.C. is in school.

Since the parenting plan was first established, Father and Mother have made modifications to accommodate their work schedules and B.C.'s school schedule, and, because B.C. regularly spends time with both parents, there has been a significant amount of driving done under the voluntarily modified plan (current plan). The amount of overnights B.C. spends with each parent has also varied from week to week, depending on their work schedules. Under the current plan, B.C.'s paternal grandfather (Grandfather) and Mother's eighteen-year-old daughter assist with B.C.'s care and transportation as needed.[11]

6. Both parties' motions also sought relief related to child support and attorney's fees; however, neither child support nor attorney's fees are at issue in this appeal; therefore, they are not addressed.

7. The distance between Father's first Kansas City residence and Mother's Independence residence was approximately twenty-five to twenty-six miles (a thirty-five-minute drive one way).

8. The distance between Father's new residence and Mother's Oak Grove residence is approximately thirty-six miles (a forty-minute drive one way).

9. Mother works from 8:00 a.m. to 5:00 p.m. on Monday, Tuesday, Thursday, and Friday, and from 7:00 a.m. to 4:00 p.m. on Wednesday.

10. Father's shift normally starts at approximately 6:30 a.m., and ends at 6:30 or 7:00 a.m. the following morning.

11. Mother testified in detail about the current plan. Under this schedule, B.C. spends Monday night with Father. Mother drives to Liberty on Tuesday after work to pick up B.C., who stays with Grandfather until Mother arrives, and B.C. then spends Tuesday night in Oak Grove. On Wednesday morning, Mother drives B.C. to Independence to meet Father (Mother leaves Oak Grove at approximately 6:45 a.m.), and Father takes B.C. to school in Liberty. B.C. spends Wednesday and Thursday nights with Father. On Friday afternoon, Mother drives to Liberty to pick up B.C., who is with his Grandfather, and B.C. spends Friday night in Oak Grove. Mother drives B.C. back to Independence on Saturday morning at approximately 7:20 a.m., where they meet Father, and B.C. spends Saturday night with

Mother testified that Father and Grandfather do not provide her with B.C.'s backpack or homework assignments. However, she received B.C.'s report card, attended a parent-teacher conference, and asked his teacher to write down anything important she should know and to then send that information home with B.C.

Mother's proposed parenting plan changed B.C.'s address for educational and mailing purposes to Mother's address. Mother's residence is one mile from an elementary school and she testified that, should B.C. attend school in Oak Grove, she made arrangements for B.C.'s care before and after school either at daycare or with her daughter. Mother also testified that, if B.C. attended school in Oak Grove, both she and Father would maintain a similar parenting time schedule, but that the new arrangement would not require B.C. to wake up as early to get to school. Father testified that, under Mother's proposed parenting plan, he would lose over half his time with B.C. because much of their time together is before and after school. Father also testified that B.C. has been active in baseball, that he played on a club team in the past, that he plans to try out for the baseball team again in 2012, and that Father may assist in coaching the team.

The GAL testified that her proposed parenting plan—the same plan Mother proposed—was in B.C.'s best interests, and that it took into account Mother's and Father's work schedules, the distance between their residences, and B.C.'s school schedule. She testified further that her proposed plan eliminated the need for third party assistance as much as possible, including the assistance currently provided by Grandfather. She testified that her proposed plan "maximize[d] the parents' time and put[ ] the responsibility of transporting on [them]." She further noted that the plan assumed that, on the days when Mother is not working (primarily on the weekend), she would transport B.C. to Father's residence, and, on days when Father is not working, he would transport B.C. to Mother's residence.

After reviewing the relevant best interest factors and finding that there had been a change in circumstances, the court determined that a modification to both the parenting time schedule and the residential designation was in the best interests of B.C. The court adopted the parenting plan proposed by both Mother and the GAL.[12] Under this new plan, B.C.'s address for educational and mailing purposes changed to Mother's address, and the following modified parenting time schedule was adopted:

> Father. Mother drives to Independence Sunday evening at 7:00 p.m. to meet Father and pick up B.C., and B.C. then spends Sunday night in Oak Grove. Mother drives B.C. back to Liberty on Monday morning and drops him off with Father before school. This schedule repeats weekly unless an adjustment is made by agreement of the parties.

12. The judgment does not expressly state that the residential designation for educational and mailing purposes is changed to Mother's address. However, this change is implicit in the language of the court's order. The court adopted Mother's proposed parenting plan, described in detail the daily/weekly schedule, and stated "the Court assumes that no party was requesting modification of any other portion of the existing parenting plan other than the daily/weekly schedules and residential designation." The only portion of the proposed plan attached to the court's order (marked as "Exhibit 10"), and, thus, the only portion included in the record on appeal, is a printout of a monthly calendar with times for drop-off and pick-up of B.C. Because both parties agree that the designation was changed to Mother's address, in affirming the judgment, we also affirm the change in residential designation.

During week 1, the Mother will have the child on Sunday and take the child to school on Monday morning. Father will pick up the child either after school or at 3:30 p.m. and take him to school the following morning. The Father will then have the child from Thursday after school from 3:30 p.m. until 8:00 p.m. Mother will have the child over the first weekend.

During week 2, Father will pick up the child at 7:00 p.m. Sunday evening and take the child to school Monday morning. The Father will then pick up the child on Wednesday evening at 3:30 p.m. or after school and keep him the evening to return him to school on Thursday morning. The Father will then pick up the child Saturday morning at 7:20 a.m. and keep him until 7:00 p.m. on the Sunday beginning [w]eek 3.

During week 3, Father will have the child on Sunday until 7:00 p.m. Father then will pick up the child at 3:30 p.m. or after school on Tuesday of that week and take him to school the following morning. The Father will then pick up the child the Friday of that week at 3:30 p.m. or after school and keep him until 7:00 p.m. on the following Saturday.

During week 4, Father will pick up the child at 3:30 p.m. or after school on Monday and deliver him to school the following morning. The father will then pick up the child on Thursday of that week and keep him from 3:30 p.m. until 8:00 p.m.

The judgment states that, "[a]t all other times not identified, Mother will have the child." The court left in effect the portions of the original parenting plan established in 2006 for all other issues not related to the daily/weekly schedule and residential designation. Father filed a motion for new trial or, in the alternative, for rehearing and/or to present additional evidence. The motion was denied, and this appeal followed.

## Standard of Review

"We will affirm the judgment of the trial court unless it is not supported by substantial evidence; it is against the weight of the evidence; or it misstates or misapplies the law." *Murray v. Murray*, 318 S.W.3d 149, 152 (Mo.App. W.D.2010). "We will not reverse the trial court's judgment on the basis that it is against the weight of the evidence unless we have a firm basis for concluding that the judgment is wrong or that it is against the logic of the circumstances." *In re Steggall*, 296 S.W.3d 25, 27 (Mo.App. W.D.2009). A determination of custody issues will not be disturbed unless we are "firmly convinced it is erroneous and the award is against the child's best interests and welfare." *Bather v. Bather*, 170 S.W.3d 487, 492 (Mo.App. W.D.2005).

When reviewing a child custody judgment, more deference is given to the trial court than in any other type of case. *Mantonya v. Mantonya*, 311 S.W.3d 392, 395 (Mo.App. W.D.2010).[13] " 'Judging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none,

**13.** As discussed in the analysis, *infra*, we apply a slightly different standard when reviewing the modification as to sub-issues of custody (e.g., the parenting time schedule or the child's residential designation) than when reviewing the modification of the custody arrangement itself (e.g., sole versus joint physical custody). In all cases involving child custody issues, however, whether the issue on appeal is a modification to the custody arrangement or a modification to the parenting time schedule, we give greater deference to the trial court's decision than in other cases, and we must be firmly convinced that the decision was not in the child's best interests in order to find it erroneous.

part, or all of the testimony of any witnesses.'" *Potts v. Potts*, 303 S.W.3d 177, 184 (Mo.App. W.D.2010) (quoting *Kester v. Kester*, 108 S.W.3d 213, 218 (Mo.App. S.D. 2003)). Moreover, we will "affirm the judgment of the trial court on any ground supported by the record." *Heslop v. Sanderson*, 123 S.W.3d 214, 221 (Mo.App. W.D.2003). "We view the evidence in the light most favorable to the decree and disregard all contrary inferences and evidence." *Jones v. Jones*, 277 S.W.3d 330, 334 (Mo.App. W.D.2009).

## Analysis

### I. Modification of the parenting time schedule and B.C.'s address for educational and mailing purposes

In his first point on appeal, Father argues that there was not substantial evidence presented to show either a change in circumstances or that the modification was in the best interests of B.C. The modification changed B.C.'s address for educational and mailing purposes to Mother's address and modified the parenting time schedule. The custodial arrangement was not modified, and both parties testified that they wanted to retain the joint custody status awarded in 2006. It is clear from the record that the main issue in this appeal is the change in B.C.'s address for mailing and educational purposes. This change means that B.C. will attend school in Oak Grove, rather than Liberty, thus necessitating changes in travel times and sched-

ules. There appears, however, to be some confusion between the parties as to whether a change in the residential designation constitutes a modification to the custodial arrangement or if it simply changes terms related to the custodial arrangement.[14]

When a party files a motion to modify "custody," the party may seek to modify the custodial arrangement or simply a related term, such as the parenting time schedule. In the present case, Mother requested a change in B.C.'s address for educational and mailing purposes and a modification to the parenting time schedule. Father requested a modification to the parenting time schedule and sought to maintain his address as B.C.'s designated residence for educational purposes. In order to clarify the legal standard for modification within the context of this case, we will first briefly discuss the term "custody," the various contexts in which the term is used, and specifically the context in which it is used in this case.

■ "Custody" is defined as: "joint legal custody, sole legal custody, joint physical custody or sole physical custody or any combination thereof." § 452.375.1.[15] The address designated for a minor child's educational and mailing purposes and the parenting time schedule are considered to be sub-issues of custody. *Buchanan v. Buchanan*, 167 S.W.3d 698, 702 (Mo. banc 2005); *see, e.g., Mantonya*, 311 S.W.3d at 402 n. 7 (indicating that a modification of the child's address for educational pur-

14. Father argues that he is "not seeking a change in custody," that he is "seeking to keep the custody arrangements the same and simply change the physical custody schedule to accommodate the changes." He further argues that "[t]he court erred in changing custody as the appropriate remedy was to rearrange the physical custody schedule rather than change custody." Father asserts that a change in the residential designation is a change in the custodial arrangement. Mother's argument does not specifically mention the change in the residential designation but focuses on the assertion that the modification of parenting time was supported by the evidence in that there was sufficient proof of a change in circumstances and the modification serves the best interests of B.C.

15. All statutory references are to RSMo 2000, as updated through the 2011 cumulative supplement, unless otherwise noted.

poses would be a modification to the parenting plan, not a change to the form of custody). Therefore, the term "custodial arrangement" can reasonably be interpreted "to be limited . . . to those instances where a court was being asked to decide which *form* of 'custody' to award." *Mantonya*, 311 S.W.3d at 398 n. 4 (emphasis added). Thus, a change to the residential designation, a sub-issue of custody, is a change in a term related to the joint physical custody schedule and is not a change to the custodial arrangement. *See Hightower v. Myers*, 304 S.W.3d 727, 729, 734–36 (Mo. banc 2010) (holding that a modification to the child's residential designation for educational purposes is simply a change in a term related to the joint physical custody schedule).

■■■■ The standard for modification found in section 452.410.1 applies when a party seeks to modify the custodial arrangement, as well as when a party seeks to modify a term related to the custodial arrangement, such as the parenting time schedule.[16] *See Russell v. Russell*, 210 S.W.3d 191, 193–94 (Mo. banc 2007) ("[T]he proper standard for modification of a joint physical custody judgment is that found in sec. 452.410.1."). A modification will be granted if the court finds, "upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child." § 452.410.1. In all cases, the burden of proof is on the party seeking modification to show the required change in circumstances. *Bather*, 170 S.W.3d at 493.

■■■■ When a party seeks to modify the custodial arrangement, "the change in circumstances necessary to modify a prior custody decree must be a 'substantial' one." *Russell*, 210 S.W.3d at 196 (quoting *Searcy v. Seedorff*, 8 S.W.3d 113, 117 (Mo. banc 1999)). However, "[t]he requirement that the change be *substantial* is no longer appropriate where simple shifts in parenting time are at issue." *Id.* at 197 (emphasis added) (noting that a substantial change is now required only when a party seeks to change the custodial arrangement, for example, from joint custody to sole custody). Therefore, in order to modify the residential designation and the parenting time schedule, as requested in the present case, the moving party must demonstrate a change in circumstances; the change, however, need not be substantial.

### A. Change in circumstances

In support of her motion to modify, Mother alleged the following: Father's work schedule made it difficult for him to spend time with B.C.; Father was acting in a manner that could be threatening to B.C.; B.C. may have witnessed domestic violence on one occasion involving Father and another person; Father could not adequately protect B.C., and the environment

16. In *Russell v. Russell*, 210 S.W.3d 191, 194 (Mo. banc 2007), the court held that a modification to parenting time is still a modification to the prior judgment, even though it does not change the custodial arrangement itself, and therefore, the party seeking modification must show a change in circumstances pursuant to the standard found in section 452.410.1. Where one party has sole physical custody and the other has visitation, however, a change to visitation requires a showing only that the "proposed change be in the best interests of the child," and a change in circumstances is not required. *Id.* at 193; *see also* § 452.400.2. In the present case, the parties have joint custody and seek a modification of the parenting time schedule and residential designation; they do not seek to modify the custodial arrangement itself. Thus, the standard found in section 452.410.1 is appropriate.

he provided was harmful to B.C.; Father made appointments for B.C. that were not relayed to Mother, and she was, therefore, uninformed on health issues; and Father made school arrangements without input or direction from Mother.

In support of his motion to modify, Father alleged the following: B.C. was five and would be attending kindergarten in the fall of 2010;[17] Mother moved approximately forty-three miles (fifty minutes) from Father's residence; Mother's work schedule required her to wake B.C. significantly earlier in order to return him to Father in time for school; and Mother's current parenting time would cause significant disruption in B.C.'s schedule when he began school full-time.

In its findings, the court stated that "since the prior Judgment was entered in 2006, significant, continuing and meaningful changes in circumstances have occurred regarding the minor child and his custodians."[18] The court found the following changes in circumstances justified modification: B.C.'s educational situation and commitments had changed and he had a much more structured and rigid schedule; both parents had moved and lived significantly further away from each other; the employment status of the parties

changed;[19] both parties had voluntarily modified the existing parenting plan (specifically with transportation and exchanges) as needed to accommodate their schedules; and Grandfather had assisted with child care and transportation.

Father argues that Mother "failed to present substantial evidence to support the allegations made in her motion to modify" and that she "failed to present substantial evidence showing there had been a change in circumstances regarding the child or his custodian." Our review, however, is not limited to whether Mother proved her specific allegations in her motion. *See Heslop*, 123 S.W.3d at 221 (holding that we will "affirm the judgment of the trial court on any ground supported by the record"). Therefore, we look at all of the evidence presented to determine if the judgment is supported by the record.

We do not need to address the issue of whether Mother presented any evidence of changed circumstances. Both Father and Mother filed motions alleging that there had been a change in circumstances sufficient to justify a modification, and both parties presented evidence. Although Father does not believe that the findings of the trial court were supported

---

17. At the time the judgment was entered in June of 2012, B.C. was seven years old and in the first grade.

18. As noted, *supra*, the trial court is not required to make a finding that the change in circumstances was substantial in this case because neither party sought a change to the custodial arrangement itself; instead, they sought to change only parenting time and residential designation. Likewise, the change did not have to be "continuing," despite the language in the findings, because "that is the standard for a modification of child support, not custody." *Hightower*, 304 S.W.3d at 734.

19. The judgment states that "the employment status of the *parties* has changed." Father argues that this finding is not supported by

the evidence in that his employment has not changed. The findings specify only changes to Mother's employment. At the time of the 2006 judgment, Mother was unemployed. At the time of the motion hearing, she was employed in Lexington, Missouri. Father now works one to two days a week at a second job, and his work schedule as a firefighter has changed from thirty-six hours on duty/thirty-six hours off duty to twenty-four hours on duty/forty-eight hours off duty. Although the details of the changes in Father's employment are not in the findings, they are in the record, and therefore the statement by the court that the parties' employment has changed is, in fact, supported by the evidence.

by substantial evidence, "[h]aving pleaded and presented evidence of a change in circumstances warranting modification of custody, Father cannot now be heard to complain that there was no change in circumstances."[20] *Bather*, 170 S.W.3d at 493; *see also Doerhoff v. Salmons*, 162 S.W.3d 498, 500–01 (Mo.App. W.D.2005). Therefore, "[Father's] only cognizable argument on appeal is that the trial court's modification of the parenting time was not in [B.C.'s] best interest." *Bather*, 170 S.W.3d at 493.

### B. Best interests of the child

The trial court, as required, reviewed and discussed the relevant best interest factors found in section 452.375.2, and also discussed an additional factor not found in the statute. *See Buchanan*, 167 S.W.3d at 702 ("So long as any issue or sub-issue of custody is subject to contest between the parties and resolution by the court, written findings that include discussion of the applicable factors from section 452.375.2 are required."). In determining parenting time, unless a court specifically finds otherwise, it is "the public policy in Missouri that frequent, continuing, and meaningful contact with both parents is in the best interest of the child and that any custody determination should further this policy." *Hightower*, 304 S.W.3d at 735 (citing § 452.375.4). But there is no requirement that parenting time be equally divided between Mother and Father where they share joint physical and legal custody. *Doerhoff*, 162 S.W.3d at 501. Additionally, in performing the best interest analysis, a

trial court can consider whether the parties have "devised and followed their own schedule without substantial problem." *Id.* The ultimate issue on appeal is "whether there was an evidentiary basis supporting the modification ordered by the court." *Id.* A modification will be upheld where "there is substantial evidence in the record" that it is in the best interests of the child. *Id.*

The trial court discussed the relevant statutory best interest factors found in section 452.375.2. In addressing the first factor (the wishes of the parents as to custody and their proposed parenting plans), the court noted that Father's proposed plan was not significantly different from the plan the parties were then operating under and that his plan would require the continued assistance of Grandfather. The court also noted that Mother's proposed plan (also the GAL's proposed plan) took the parties' work schedules, the proximity of their residences, and B.C.'s school schedule into account, and maximized the opportunity for parenting time for both parties without regular reliance on third parties.

In addressing the second factor (the need for B.C. to have frequent, continuing, and meaningful contact with both parents and their ability and willingness to act as parents for their child's needs), the court found that both Father and Mother illustrated a willingness to perform their functions as parents "with minor exceptions." The court found that Father's work sched-

---

**20.** Father's brief states: "Although Father acknowledges there has been a change in circumstances, the changes are not significant enough to change custody." Father goes on to argue that "[t]he court erred in changing custody as the appropriate remedy was to rearrange the physical custody schedule rather than change custody." As noted, *supra*, Father and Mother retain joint physical and legal custody, and a change in the child's residence for mailing and educational purposes and a modified parenting time schedule are not changes in the custodial arrangement. These modifications are, in fact, a rearrangement of the physical custody schedule. In reality, Father's complaint is that these are not the "rearrangements" he preferred.

ule "reduces his ability ... to perform all his parental duties while the child is in his custody," and noted specifically the need for Grandfather to provide assistance. The court also noted that the current plan reduced Mother's ability to be actively involved in B.C.'s educational experience, relying specifically on the evidence that Father and Grandfather failed to send B.C.'s backpack and schoolwork to Mother's home.[21]

In addressing the third factor (the interaction and interrelationship of B.C. with parents, siblings, and others who may significantly affect B.C.'s best interests), the court found that B.C. had relationships with individuals at both residences, including Grandfather (at Father's residence) and his half-siblings (at Mother's residence), and that both proposed parenting plans allow continued interaction with these individuals.

In addressing the fifth factor (B.C.'s adjustment to home, school, and community), the court found that B.C. had adjusted well to school and both parents' homes and communities, noting specifically that B.C. adjusted well to a change of school when he transferred to the Liberty School District to begin first grade.

In addressing the fourth and sixth factors (which parent is more likely to allow frequent, continuing, and meaningful contact with the other parent, and the mental and physical health of everyone involved, including any history of abuse), the court found that there was no credible evidence that either party wished to restrict B.C.'s contact with the other parent, that neither

proposed plan would substantially reduce either party's time with B.C., and that there was no credible evidence that either party abused the other or B.C.

The court found that the seventh and eighth factors (the intent of a parent to relocate and the wishes of the child), were irrelevant to its findings because there was no testimony from either party regarding a present intent to relocate, and B.C.'s wishes were not elicited due to his age and maturity level.

As a relevant factor not found in the statute, the court noted the "elaborate and burdensome transportation and exchange procedures" under the current plan. The court stated that the existing transportation and exchange procedures seemed to serve the parties' own desires for parenting time and that forcing B.C. to endure this "convoluted, hectic, bewildering, and brutal daily schedule" was perhaps done "simply to stubbornly refuse to cede additional parenting time to the other parent." The court noted further that both parents had lost sight of what was important—their child's well being and best interests. The court found that neither the current plan, nor the parenting plan as it was set in June 2006, served the child's best interests, and, thus, a modification was necessary.

Under the current plan, B.C. spends a significant amount of time traveling between his parents' residences, and Father relies on Grandfather to assist with care and transportation when he is at work. Father argues that the new plan does not "resolve the problems it sought to elimi-

---

21. There was also evidence that, when B.C. was in kindergarten, Mother had refused to return B.C. to Father so he could attend school, and in light of that, the court stated: The court strenuously disagrees with [Mother's] actions regarding the child's [school] attendance in the past, as she refused to send the child to school on the mornings she had custody. However, this problem has been remedied for approximately 1 year, and the child has not had recurring absences or any other problems with school since then.

nate," and that "instead of Mother returning the child to [him], [he] now returns the child to Mother." He also argues that B.C. continues to be transferred during the week and has to get up early, and that "[t]he only difference is a change in residential custody." We disagree with Father's assertions.

The court took great care to look at all the best interest factors and discuss each relevant factor. The court specifically noted that the new plan attempted to maximize the time B.C. would spend with each parent, while eliminating both the time B.C. would spend traveling between residences and the need for third parties, specifically Grandfather, to assist in transportation and care. Moreover, and most importantly, B.C. will travel less under the new plan. Although the parenting time arrangement is still quite elaborate and slightly convoluted, from our understanding of the former and new parenting plans, the new plan limits the amount of time B.C. spends traveling between his parents' residences and minimizes the number of times each week that B.C. is transported across town early in the morning, before school. Under the current plan, B.C. travels between residences at least six times each week, two of those trips being on school mornings. Under the new plan, it appears that he will travel between residences two times the first week, five times the second and third weeks, and two times the fourth week.[22] Further, for three of the four weeks, B.C. is transported across town before school only once.

While it is true that, under the new plan, Father will be providing all of the transportation between his home and Oak Grove (whereas, in the past, Mother drove

to Father's home in Kansas City or to B.C.'s school in Liberty three times a week and met Father in Independence to exchange custody three times a week), the more important factor is that B.C.'s overall travel time will decrease.

We also note that, despite the change in B.C.'s address for educational purposes (and, thus, the change in where he attends school), B.C. will still have frequent, continuing, and meaningful contact with both parents. After a careful review of the record, we are not left with the firm belief that the trial court's allocation of parenting time between Mother and Father, or the change in B.C.'s residence to Mother's address for educational and mailing purposes, is erroneous.

Point I is denied.

## II. Burden of proof

 In his second point on appeal, Father argues that the court's findings in addressing the best interest factor of B.C.'s adjustment to home, school, and community, improperly shifted the burden of proof. In its findings, the court stated:

> Because the child spends significant periods of time with each parent, he is adjusted well to both parents' homes and communities. The child attends a different school for 1st [grade] currently than he attended in kindergarten. The evidence indicates that he has adjusted well to school generally, and specifically to the change of schools. *Since [Father] did not believe it was a significant problem for the child to change schools once, during his early elementary school education, the Court assumes he cannot now argue that it would be a significant problem for him to do so again. Moreover, [Father] did not make this argument at trial.*

---

22. This breakdown of days traveled assumes that, on the two nights each month that Father has B.C. from 3:30 p.m. until 8:00 p.m.,

he is not driving B.C. back and forth from Oak Grove to Kansas City.

(Emphasis added.) Father argues that the court erred in shifting the burden of proof to him in that the party seeking affirmative relief, Mother, has the burden in this case. While only Mother sought a change in the residential designation, both parents sought a change in the parenting schedule, which triggered the best interests of the child analysis. Therefore, Father and Mother are bound by the same burden of proof.

Further, we find that the court's statement at issue here does not shift any burden. The court found six of the eight statutory best interest factors relevant, and noted one additional relevant factor—travel—in its discussion. The factor involving B.C.'s adjustment to home, school, and community is just one of the relevant factors in the court's analysis. The statement of the trial court, set out above, is an observation of the evidence presented—or, more specifically, not presented. Therefore, a comment that Father did not present any evidence that changing schools at this stage would have a negative effect on B.C. does not shift any burden, as the court is simply making an inference based on Father's testimony and the evidence presented.

Point II is denied.

## Conclusion

The trial court's judgment is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. Therefore, the judgment is affirmed.

LISA WHITE HARDWICK, Presiding Judge, and JAMES M. SMART, JR., Judge, concur.